UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Michaele Jackson,

       Plaintiff,

v.                                                                Case No. 12-12844

Motorcity, an assumed name of                Sean F. Cox
Detroit Entertainment, L.L.C.,                    United States District Court Judge
a Michigan limited liability company,

       Defendant.
_____/

**<u>OPINION & ORDER</u>**

       Plaintiff filed this action against his current employer, alleging that it has discriminated

and retaliated against him, in violation of the Family Medical Leave Act ("FMLA") for his

having exercised his rights under the act.  The matter is currently before the Court on

Defendant's Motion for Summary Judgment.  The parties have briefed the issues and the Court

heard oral argument on October 7, 2013.  For the reasons stated below, the Court shall GRANT

IN PART AND DENY IN PART Defendant's Motion for Summary Judgment.  The Court shall

grant the motion to the extent that the Court shall dismiss, as time-barred, Plaintiff's retaliation

claims based upon Plaintiff's April 5, 2009 suspension from the cell phone incident and

Plaintiff's April 10, 2009 suspension for abandoning his post.  The Court shall deny the motion

in all other respects.  Accordingly, Plaintiff's retaliation claims based upon his July 2, 2009

termination, and having been assigned to colder-climate posts for more than 70 days straight in

the wintertime, shall proceed to trial.

# BACKGROUND

Plaintiff Michaele Jackson ("Plaintiff" or "Jackson") filed this against his current employer, Defendant Detroit Entertainment, L.L.C., d/b/a, Motorcity Casino Hotel ("Defendant" or "MotorCity"), on June 27, 2012. Jackson's Complaint asserts the following claims: "Violation of the FMLA" (Count I); and "Discrimination in Violation of 29 U.S.C. § 2614(a)(1)" (Count II).

Following the close of discovery, Defendant filed a Motion for Summary Judgment. This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

Both parties complied with the Court's practice guidelines for motions for summary judgment such that: 1) along with Defendant MotorCity's Motion for Summary Judgment, it filed a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.") and 2) along with Plaintiff's Response, Plaintiff filed his "Counter Statement of Disputed Facts" (Pl.'s Stmt.").

2

The following material facts are gleaned from the parties' statements and the evidence submitted by the parties, *taken in the light most favorable to Plaintiff.*

Jackson is currently employed as a Security Officer by MotorCity, having been hired into that position on August 15, 2001. (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1).

As a Security Officer, Jackson's job duties include observing and safeguarding MotorCity's guests and employees and monitoring and protecting MotorCity's property and assets. (*Id*. at ¶ 2). Jackson's employment as a security guard is subject to a collective bargaining agreement ("CBA") negotiated between MotorCity and the Security, Police and Fire Professionals of America ("SPFPA") union. (*Id*. at ¶ 3). MotorCity's CBA with SPFPA states that progressive discipline (beginning with a written warning) will be applied when appropriate, but that MotorCity is entitled to immediately suspend or terminate an officer for certain offenses, including insubordination, misconduct or incompetence. (*Id.* at ¶ 4).

MotorCity's Security Department Code of Conduct states that: "[s]ecurity Officers will, at all times, be courteous, patient, and respectful in their dealings with others . . . and will not use harsh, profane or derogatory language towards any person"; "[n]o Security Officer will be insubordinate or disrespectful toward any owner, Director of Security, Department Director, or Security Supervisor"; and that the "[u]se of profane or abusive language, or engaging in lewd, obscene, or other unbecoming conduct" is prohibited and that "[a]ll officers will refrain from using profanity at all times while on duty." (D.E. No. 19-5 at Pg ID 269, 270, 272).

MotorCity Security Officers are prohibited from carrying personal cell phones while working. (Def.'s Stmt. at ¶ 12; Pl.'s Stmt. at ¶ 12).

Jackson has never been denied FMLA leave at MotorCity and has taken leave at various

times. (Def.'s Stmt. at ¶ 7; Pl.'s Stmt. at ¶ 7). In May 2006, Jackson requested and was approved for continuous FMLA leave due to acute stress, and was absent from work for about one month. (*Id*. at ¶ 6). Jackson later requested and was approved for continuous FMLA leave in 2006. (*Id*. at ¶ 9). On April 22, 2009, Jackson requested and was approved for continuous FMLA leave through June 30, 2009. (*Id*. at ¶ 10). Since his April 22, 2009 continuous FMLA leave, Jackson has only used intermittent leave. (*Id*. at ¶ 11).

On April 4, 2009, Jackson used FMLA leave to report late for work. (*See* Ex. D to Pl.'s Br.). On the next day, April 5, 2009, Jackson was suspended for two days for carrying a personal cell phone while working. (Ex. K to Def.'s Br.). That incident involved a cell phone ringing during role call.

Jackson denies that it was his cell phone that rang during role call. Jackson states that when he was called to supervisor Virginia Allen's office to discuss the matter, she told him that he had a choice of accepting two-day suspension or that he could fight it and could face a five-day suspension. (Pl.'s Afft. at ¶ 16). Jackson chose to accept a two-day suspension. (*Id.* at ¶ 17). That suspension was from April 8, 2009, to April 9, 2009.

Later that same day, on April 5, 2009, Jackson requested FMLA leave to go home early due to an asthma attack. (Jackson Afft. at ¶ 18). Prior to his leaving work that day, Allen accused Jackson of leaving his post without permission. (*Id*. at ¶ 19).

On April 5, 2009, apparently before serving the suspension from the cell phone incident or leaving work for FMLA leave, Jackson left his assigned post without approval from his supervisor. (Pl.'s Dep. at 70-71). Jackson asked another security officer, who was not a supervisor, to cover his post so that he could go tell Hotel Services that an elevator was not

4

working. (*Id.*).

When Jackson returned from serving his two-day suspension from the cell phone incident, on April 10, 2009, he was issued a disciplinary notice regarding having left his assigned post on April 5, 2009.  (Ex. L to Def.'s Br.).  This notice states that Jackson violated company policy by leaving his assigned post without approval by his manager.  The supervisor who issued that notice was Allen.

During his deposition, Jackson indicated that he disagrees with his being written up for leaving his post because he had another officer cover his post and "[a]s long as your post is covered it should be all right."  (Pl.'s Dep. at 70).

In the section of the Disciplinary Notice form that allows the employee to write his response, Jackson wrote:

> Well after 4 days later they give me this write up.  So it's be spikeful [sic].  When they give me the two days susp. they told me if I don't sign it, They was going to give me this 5 day susp.  So They lied and still gave it to me.  **That Bullshit!**  A Form of Blackballing.

(Ex. L to Def.'s Br.) (Emphasis added).  Jackson acknowledges that he told his supervisors that his suspension was "bullshit."  (Jackson Afft. at ¶ 25).  Jackson told his supervisors that he thought it was bullshit because they had gotten him to accept a two-day suspension when they planned all along to find some way to give him a five-day suspension.  (*Id.* at ¶ 25).  He also told them that they were being spiteful for his having taken FMLA time and that he felt he was being blackballed for taking FMLA leave.  (*Id.* at ¶ 26).

Allen was the supervisor who issued the April 10, 2009 discipline notice but both Allen and another supervisor, James Krygowski, were in the room when Jackson was given the

suspension.  (Allen Afft. at ¶ 6).

Jackson served his April 10, 2009 suspension on April 11, 12, 13, 16, and 22, 2009. (Def.'s Stmt. at ¶ 18; Pl.'s Stmt. at ¶ 18).

The events surrounding the Disciplinary Notice issued on April 10, 2009, ultimately led to the issuance of another Disciplinary Notice (Ex. N to Def.'s Br.) and to Jackson's termination. (Ex. O to Def.'s Br.).

Shortly after the April 10, 2009 meeting with Jackson, Director of Security William Cooper told Vice-President of Human Resources, Jo Avery, what had happened.  (Def.'s Stmt. at ¶ 20; Pl.'s Stmt. at ¶ 20).  Cooper informed Avery about Jackson's use of profane and abusive language toward his supervisor.  (Avery Afft., Ex D to Def.'s Br., at ¶¶ 11-12).  Avery's Affidavit states that she, along with Cooper, and considering a recommendation from Krygowski, decided to discharge Jackson under MotorCity's progressive disciplinary policy.  (*Id.*).  The decision to terminate Jackson was made on some unspecified date prior to April 22, 2009, but Jackson had not yet been terminated as of that date.

When Jackson returned from his five-day suspension, he went on long-term FMLA leave for approximately three months.  (Jackson Afft. at ¶ 28).  Once Jackson took FMLA leave after returning to work in April following his suspension, Avery decided to delay Jackson's termination until he returned to work.  (Avery Afft. at ¶ 15).  Jackson was permitted to remain on FMLA leave until June 30, 2009.  (*Id.*)

Jackson returned to work from his FMLA leave on July 2, 2009.  (Jackson Afft. at ¶ 29). Jackson was advised of his termination on July 2, 2009, upon his return to work.  (Avery Afft. at ¶ 16).

6

In January of 2010, Jackson was reinstated to his position at MotorCity, following negotiations with Jackson's union. (Avery Afft. at ¶17; Pl.'s Afft. at ¶ 31). Jackson was returned to work on January 25, 2010, to his same position with no change in pay or benefits. (Def.'s Stmt. at ¶ 31; Pl.'s Stmt. at ¶ 31).

Jackson was suspended again on July 20, 2011, for leaving his post without permission. (Ex. R to Def.'s Br.) That incident was apparently captured on surveillance film and involved Jackson leaving his assigned post to go speak with a woman working at the Grand River Deli. Jackson acknowledged that he left his post to go into the Grand River Deli, but testified that he did so because he needed a toothpick. (Pl.'s Dep. at 133-35).

On January 4, 2012, Jackson was suspended for failing to be alert, by having his head down, resting on his hands, while on post. (Ex. S to Def.'s Br.; Avery Afft. at ¶ 20). Jackson acknowledged during his deposition that he had his head down and in his hands but stated that he did so just briefly and because he had a headache. (Pl.'s Dep. at 116; Pl.'s Afft. at ¶¶ 35-36).

The assignment of Security Officers at MotorCity to their posts is a management right. (Def.'s Stmt. at ¶ 40; Pl.'s Stmt. at ¶ 40). The assignment of a Security Officer at MotorCity to a post is a work assignment, and assignment to a specific post does not result in any change in salary or benefits to the Security Officer assigned to the post. (Def.'s Stmt. at ¶ 41; Pl.'s Stmt. at ¶ 41).

Jackson testified that, with respect to post assignments, he does not care where he is assigned. (Def.'s Stmt. at ¶ 42; Pl.'s Stmt. at ¶ 42). He also testified that he does view any particular post assignments as more desirable. (Pl.'s Dep. at 53). But he also testified:

Q.     So it makes no difference to you what specific post assignment you

7

|      |                                                                                      |
|------|--------------------------------------------------------------------------------------|
|      | receive?                                                                              |
| A.   | No, but it do [sic] mean something to me when I'm there, because I've called FMLA, they want to put me on a punishment post. |
| Q.   | Why do you perceive an assignment as punishment?                                      |
| A.   | Because when I do it over and over again, three days in row, four days in a row, that's considered punishment. |
| Q.   | In your mind?                                                                          |
| A.   | Through – no, through the Security Department, not just me.                            |

(Pl.'s Dep. at 54).

In response to Defendant's Motion for Summary Judgment, Jackson submitted an

Affidavit that states:

| 38. | I have also been treated differently than other security officer and subjected to job assignments that no one wants. |
|-----|---------------------------------------------------------------------------------------------------------------------|
| 39. | Between December and February I was stationed outside 74 straight days.                                              |
| 40. | Being rotated outside during the winter months is part of the job, but to be posted out there for 74 straight day [sic] because I take FMLA time is miserable. |
| 41. | I did not want to be posted outside everyday during the winter.                                                      |

(Pl.'s Afft. at ¶¶ 38-41).

During his deposition Jackson testified that some of the posts he was assigned to were not

literally "outside," but rather involved posts that were on a loading dock with doors to the

outside, and in vestibules and booths, some of which have heaters.  (Pl.'s Dep. at 161-64).  But

his testimony also indicates that those posts were still colder environments than regular indoor

posts:

| A.   | You're in a vestibule.                                                         |
|------|-------------------------------------------------------------------------------|
| Q.   | Okay.                                                                          |
| A.   | But you get a heater against 19 degrees, let's see who wins.                   |
| Q.   | And the casino dock, where is that?                                            |
| A.   | Off Grand River.                                                              |
| Q.   | And is that – are you outside all the time or when the doors are closed you're not? |
| A.   | Sometimes the doors are broke.                                                 |

8

> Q.     But there are doors?
> A.     The doors are broke.

(Pl.'s Dep. at 163; *see also* Pl.'s Dep. at 98-99).  Jackson also testified as follows:

> Q.     How many different posts or positions are there for security guards
>        throughout the casino?
> A.     Like stand or like regular posts?
> Q.     No, standing or walking around.
> A.     Oh. On a good day, there will be – you've got the four mobiles.  You've
>        got maybe three or four that will on the first floor.  You've got one person
>        in valet.  You've got maybe four on the second floor.  And you've got two
>        there where the people come in at.  So that's four more.  So there's like
>        about 20, maybe 25 a day.
> Q.     Okay.  So if they were to switch you around from post to post every day,
>        over the course of 70 days you could have worked every position two or
>        three times?
> A.     Yes.
> Q.     Okay.  But for the last 70 days, you've only been outside or in a position
>        that was near the cold?
> A.     Yes.

(Pl.'s Dep. at 165).

During his deposition, Jackson testified that security supervisor Jim Krygowski has frequently used profanity at the workplace.  (Pl.'s Dep. at 102).  Krygowski made comments such as calling employees "black mother fucker," telling a white employee "take your white ass out of here" or "I'm going to throw your ass the fuck out of here."  (*Id.*).  Jackson testified that Krygowski had called him, personally, a "black mother fucker."  (*Id.* at 103).  Jackson reported those comments by Krygowski to Jo Avery in Human Resources.  Avery and Bill Cooper told Plaintiff that they did not feel that conduct was harassment but Jackson heard that Krygowski was suspended for a week. (*Id.* at 103-104).

9

**ANALYSIS**

As explained in *Taylor v. Union Institute*, 30 Fed. Appx. 443, 452 (6th Cir. 2002), the

FMLA creates prescriptive and proscriptive employee rights:

> The prescriptive rights created by the Act provide "entitlements" to employees
> and "set floors for employer conduct." To prevail on the basis of the Act's
> prescriptive rights, the plaintiff need not show that she was treated worse than
> other employees, just that she was denied the Act's entitlements. Proscriptive
> rights, on the other hand, prohibit disparate employer conduct with regard to
> employees taking leave.

*Id.* Thus, "[t]here are two distinct theories for recovery under the FMLA: (1) the 'entitlement' or

'interference' theory arising from 29 U.S.C. §2615(a)(1); and (2) the 'retaliation' or

'discrimination' theory arising from 29 U.S.C. §2615(a)(2)." *Smith v. Aco, Inc.*, 368 F.Supp.2d

721, 731 (E.D. Mich. 2005); *see also Daugherty v Sajar Plastics, Co.*, 544 F.3d 696 (6th Cir.

2008).

Here, Plaintiff's asserts two separate FMLA counts, but both counts assert a retaliation or

discrimination theory. Plaintiff does not assert an entitlement or interference claim.

Plaintiff's Complaint alleges that MotorCity discriminated or retaliated against him, due

his exercising his rights under the FMLA, by: 1) firing him in 2009; 2) subjecting him to less

desirable duties within his same position; and 3) excessive scrutiny, isolation and harassment.

(Compl. at 3 & 4). The Complaint also alleges that the excessive scrutiny he was subjected to

included "being blamed for a cell phone ringing during Role Call and being suspended."

(Compl. at 5).

Defendant MotorCity asserts that the Court should grant summary judgment in its favor

as to Jackson's FMLA claims on three grounds.

10

I.     **The Court Shall Dismiss, As Time-Barred, Claims Based On Events That Occurred More Than Three Years Before Jackson Filed This Action**

First, MotorCIty asserts that claims based on events occurring more than two years before Jackson's suit are untimely and must be dismissed.

As both parties acknowledge in their briefs, the limitations period under the FMLA is generally two years from the alleged violation but a three-year limitation period is applied to willful violations:

(c) Limitation

(1) In general

Except as provided in paragraph (2), an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought.

(2) Willful violation

In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought.

29 U.S.C. § 2617(c).

MotorCity notes that Plaintiff filed this action on June 27, 2012.  It asserts that "[a]s such, he may not recover for any alleged violation that occurred before June 27, 2009 – three years prior to his suit.  He also may not recover for any acts occurring between June 27, 2009 and June 27, 2010 unless he proves that MotorCity willfully violated the FMLA – which he cannot do." (Def.'s Br. at 7).

A.     **Events Outside The Three-Year Period**

MotorCity contends that any claim based upon the cell phone incident suspension referenced in paragraph 31 of the Complaint is time-barred because Jackson "testified at his

11

deposition that he was suspended on April 5, 2009 for allowing his cell phone to ring during morning role call. [Pl. 62-64] Any claim for damages arising from that suspension had to be filed, at the very latest, by April 5, 2012.  Plaintiff did not file suit until June 27, 2012, and so his claim for damages for his April 5, 2009 suspension (and any other disciplines prior to June 27, 2009) is untimely under either the two– or three-year limitation period."  (Def.'s Br. at 7-8).

Plaintiff's Brief responds to the timeliness argument as to his termination, asserting that it is timely because it was willful and within three years.  But his brief does not respond to Defendant's argument that the cell phone incident, or others, are time-barred.  Nevertheless, he continues to assert a claim based on that cell phone incident. (*See* Pl.'s Br. at 18; Pl.'s Afft. at ¶¶ 10-17).  At the October 7, 2013 hearing, however, Counsel for Plaintiff conceded that any claims based upon either the April 5, 2009 suspension based on the cell phone incident, and any claims based upon the April 10, 2009 suspension for leaving his post, are time-barred.

Accordingly, the Court shall dismiss, as time-barred, any claims asserted by Jackson based upon: 1) the  April 5, 2009 suspension from the cell phone incident; and 2) the April 10, 2009 suspension for abandoning his post.

### B.    Events Outside The Two-Year Period

MotorCity also challenges, as time-barred, Jackson's claims based on his discharge in July 2009.  It asserts that:

> According to Plaintiff, this termination occurred on July 2, 2009. [Pl. 86] A claim for retaliatory termination under the FMLA accrues on the date of the termination. *Williams v. Northwest Airline*, 53 Fed. App'x 350 (6th Cir. 2002).  Under the two-year limitation period, then, Plaintiff's claim had to be filed no later than July 2, 2011.
>
> It was not.  This suit was not filed until June 27, 2012, well over two years after the July 2, 2009 discharge.  Thus, unless Plaintiff demonstrates that MotorCity Casino willfully violated the FMLA with regard to his termination, any

12

claim based on that termination is time-barred and
must be dismissed.

(Def.'s Br. at 8).

"An employer commits a willful violation of the FMLA when it acts with knowledge that

its conduct is prohibited by the FMLA or with reckless disregard of the FMLA's requirements;

therefore, the determination of willfulness involves a factual question." *Ricco v Potter*, 377 F.3d

599, 602 (2004).  Thus, the Sixth Circuit has expressed that this is generally a factual issue.

There are Sixth Circuit cases that have held that a plaintiff's *allegations* are or are not

sufficient to pursue a willfulness claim.  *See Ricco*, 377 F.3d at 603 (a plaintiff withstands a

motion to dismiss on willfulness issue if complaint alleges the FMLA violation was willful);

*Williams v. Northwest Airlines, Inc.*, 53 Fed. App'x 350, 351 (6th Cir. 2002) (two-year period

applies because no allegations that employer willfully violated the FMLA).

Here, however, Jackson has alleged that MotorCity willfully violated the FMLA. (Compl.

at ¶ 19).  Jackson contends that Allen and Krygowski knew they could not discriminate against

him for taking FMLA leave but they retaliated against him after he took FMLA leave anyway.

There is a lack of Sixth Circuit cases addressing the direct or circumstantial evidence of

willfulness needed to proceed to trial.

In its Brief, MotorCity directs the Court to a number of district court decisions.  In some,

the district court concluded at the summary judgment stage that there was no genuine issue of

material fact as to willfulness.  *See, e.g., Jackson v. Rite Aid Corp.*, 2007 WL 2324951 (E.D.

Mich. 2007).  It also directs the court to cases wherein the issue was one appropriate for the jury,

*see e.g., Rodriguez v. Ford Motor Co.*, 382 F.Supp.2d 928, 936-37 (E.D. Mich. 2005), but

attempts to factually distinguish those.

13

Given the rather unique factual circumstances under which Jackson's July 2, 2009 termination unfolded, the Court concludes that this is an issue for the jury.

## II.    Some Of Jackson's FMLA Retaliation Or Discrimination Claims Survive Summary Judgment Under The Circumstantial Evidence Approach

Defendant's brief states that while an employee can establish an FMLA retaliation claim by either direct or circumstantial evidence, Plaintiff does not claim to have direct evidence supporting his claim.  In response, Plaintiff appears to agree with the position as he does not assert that direct evidence supports his claims and he also applies the circumstantial evidence burden-shifting approach.

"An FMLA retaliation claim based solely upon circumstantial evidence of unlawful conduct is evaluated according to the tripartite burden-shifting framework set forth in *McDonnell Douglass*." *Daugherty*, 544 F.3d at 707.  A plaintiff must typically make a prima facie showing that: 1) he engaged in a statutorily protected activity; 2) his employer knew that he was exercising his FMLA rights; 3) he suffered an adverse employment action; and 4) a causal connection exists between the protected activity and the adverse employment action. *Id.*; *see also Hall v. Ohio Bell Telephone Co.*, __ Fed. App'x. __, 2013 WL 2986991 at * 5 (6th Cir. 2013).

Once a plaintiff has established a prima face case, the burden shifts to the employer to present a legitimate, non-retaliatory reason for taking the adverse employment action. *Hall, supra,* at * 5 (6th Cir. 2013).  If the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was a pretext for unlawful discrimination. *Id.*

Defendant's opening brief anticipates that Plaintiff may assert that a multitude of incidents constitute the requisite adverse action to support a prima facie case. (Def.'s Br. at 11-

14

13).

But in his Response Brief, Plaintiff does not respond to Defendant's challenges regarding all of those incidents or alleged adverse actions. Thus, Plaintiff does not appear to assert that his claims are based on all of those alleged incidents or circumstances. Rather, he appeared to limit his claims to a few select actions.

At the October 7, 2013 hearing, Plaintiff's Counsel advised the Court that Plaintiff's retaliation claims are based upon just two alleged adverse actions: 1) his termination on July 2, 2009, for his use of profane language with supervisor on April 10, 2009; and 2) Defendant posting him outside for 74 days straight during the winter.

### A.     Claim Based On July 2, 2009 Termination

MotorCity's challenge to a FMLA claim based upon the July 2, 2009 termination is two-fold.

### 1.     Causal Connection Element Of Prima Facie Case

First, MotorCity contends that Jackson cannot establish the fourth element of a prima facie case – that there is a causal connection between his protected activity and his termination.

Focusing on Jackson's FMLA leave requested and granted on April 22, 2009 as the protected activity, Motor City contends that Plaintiff cannot establish a causal connection between that activity and Avery's decision to fire Jackson because Avery made that decision before she knew of Jackson's request for leave on April 22, 2009. (Def.'s Br. at 15). In a footnote on Page 15, Motor City asserts that Jackson should not be able to establish a causal connection based on any intermittent FMLA leave as the protected activity. It provides no authority in support of that proposition.

15

In response, Jackson argues that the temporal proximity in this case is sufficient to establish a causal connection for purposes of his prima facie case, and asserts that intermittent FMLA leave can constitute the protected activity:

> In this case, Plaintiff request [sic] intermittent FMLA leave on April 4, 2009 and on April 5th he was suspended. Shortly before serving the suspension he requested FMLA leave to go home early due to an asthma attack.  When he returned to work from the 2 day suspension, he received a 5 day suspension resulting from a separate April 5th incident (abandoning his post).  When he returned to work from the 5 day suspension he went on extended FMLA time for stress and depression and when he returned to work from the 3 month FMLA leave he was terminated within 2 hours of returning.  This the textbook definition of temporal proximity, not once but three times.  It is apparent that Defendant was dead set on retaliating against Plaintiff for using FMLA time no matter what the consequences.

(Pl.'s Br. at 17)

This Court concludes that Plaintiff has met his rather minimal burden of putting forth enough evidence to create a genuine issue of fact as to causal connection for purposes of a prima facie case of retaliation.

"The burden at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a casual connection between the retaliatory action and the protected activity."  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *see also Seeger v. Cincinnati Bell Tele. Co.*, 681 F.3d 274, 283 (6th Cir. 2012).

A plaintiff can establish a causal connection by showing a close temporal proximity between protected activity and the adverse action.  *Seeger*, 681 F.3d at 283-84.  Here, the time line of relevant events is as follows:

- Jackson takes FMLA leave in 2006.

- On April 4, 2009, Jackson uses FMLA leave to report late for work.

16

- On April 5, 2009, Jackson was suspended for the cell phone incident and given a two-day suspension.

- On that same day, April 5, 2009, he requests FMLA leave to go home. Apparently before going home, he leaves his assigned post without authorization to report an elevator is down.

- Jackson returns to work on April 10, 2009, and upon returning he is given a five-day suspension for leaving his post on April 5, 2009. He is angry and calls the suspension bullshit. He serves that suspension from April 11 to April 22nd.

- On some unspecified date prior to April 22nd, Avery and Cooper decide to terminate Jackson, and considered the recommendation of Krygowski in doing so.

- On April 22nd, Jackson requests and is approved for FMLA leave until June 30th.

- Jackson returns on July 2, 2009 and is immediately terminated for his April 10, 2009 conduct.

MotorCity asks this Court to ignore Jackson's intermittent leave for purposes of assessing a causal connection, but it has provided no authority for doing so. This Court does not believe that it can simply ignore Jackson's April 4th and 5th FMLA leaves.

The Court concludes that the nearness in time between Jackson's FMLA leaves on April 4th and 5th and his suspensions and termination is sufficient in these circumstances "to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." *Seeger*, 681 F.3d at 283.

## 2.    Establishing Pretext

Second, MotorCity contends that even if Jackson could establish a prima facie claim based on his termination, he cannot establish that its legitimate, non-discriminatory reason for Jackson's termination is a prextext for FMLA-based animus.

17

A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason:  1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct.  *Hall, supra*; *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003); *Manzer*, 29 F.3d at 1084.  The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.*, that they are factually false).  With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  *Id*.  The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct.  *Id.*

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove illegal FMLA retaliation via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful retaliation.  *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

On page 19 Jackson addresses his pretext argument as to his termination for using profane language:

> Defendant also contends that it had a legitimate nonbiased reason to terminate Plaintiff because he used "profane and abusive" language.  First, there is a question of fact of whether saying a suspension is "bullshit" to a supervisor who refers to the Plaintiff as a "black mother fucker" is really "profane and abusive."  Second, Plaintiff is also being accused of using "profane and abusive" language for complaining about that he was being retaliated against ("blackballed") [sic] and that Defendant was "spiteful" against him for using FMLA time."  That is pretextural and not a legitimate non-biased reason to suspend and terminate

18

Plaintiff.

(Pl.'s Br. at 19).

### a.      No Basis In Fact

To the extent that Jackson attempts to establish pretext via the first type of showing – that the proffered reason had no basis in fact – that attempt fails.  It is undisputed that MotorCity's Security Department Code of Conduct provides that "No Security Officer will be insubordinate or disrespectful toward any owner, Director of Security, Department Director, or Security Supervisor" and that they may not "use harsh, profane or derogatory language."  (D.E. No. 19-5 at Pg ID 269 & 270).  It is also undisputed that Jackson did, in fact, verbally state that his suspension was "bullshit" when speaking with his supervisor about his discipline notice and also he stated in writing that he finds the suspension to be "Bullshit!"  Yelling "that's bullshit" directly at one's direct supervisor is directing "profanity" at that supervisor and being disrespectful.  *See Hausler v. General Elec. Co.,* 134 Fed. App'x 890 at 893, 2005 WL 1385934 (6th Cir. 2005).

### b.      Other Employees Were Not Fired Although They Engaged In Similar Conduct

To the extent that Jackson is attempting to establish pretext by the third method (by presenting evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct), that assertion has more teeth.

Jackson's brief asserts that the supervisor involved in the incident at issue had referred to him as a "black mother fucker."  Both Allen and Krygowksi were present when the suspension at issue was given to Jackson.

There is no evidence before the Court that Virginia Allen ever used such language.

19

During his deposition, Jackson testified that Allen had once used the word "hell" in speaking to

him:

> Q.   What about the circumstances beforehand? I mean, what led her to swear
> to you face-to-face? Was she swearing about you or about a customer?
>
> A.   Swearing at me while I was at that situation, at that situation.
>
> Q    Right.  But were her swear words directed to you, were they about you?
>
> A.   "What the hell is [sic] you doing here?" That is directed at you.
>
> Q.   Okay.  So you recall the specific words, "What the hell are you doing
> here?"
>
> A.   Yes.
>
> Q.   And did she believe that you were somewhere where you shouldn't be, if
> you know?
>
> A.   I can't – I don't know.
>
> Q.   Was that a possibility?
>
> A.   I don't know.
>
> Q.   Based on those words, "What the hell are you doing here," it sounds like
> she thought you were somewhere where you shouldn't be?
>
> A.   I mean, if I'm on the floor that day, I think I was where I needed to be.
>
> Q.   But you don't know why she said those words to you?
>
> A.   Right, I don't know why.
>
> Q.   You have no idea.
>
> A.   No idea.
>
> Q.   And is that the only specific instance that you can recall prior to April
> 2009, when you believe that Ms. Allen, specifically Ms. Allen, acted
> unprofessionally to you in a face-to-face?
>
> A.   That's all I can recall.

(Pl.'s Dep. at 60-61).

In response to Defendant's Motion for Summary Judgment, Jackson submitted an

Affidavit contradicting his deposition testimony regarding Allen:

> 7.   During my employment with MotorCity, my supervisors, in particular
> Virginia Allen and Jim Krygowslo [sic] *have routinely* used profanity and
> vulgar language when speaking with me.
>
> . . . .
>
> 9.   Virginia Allen, *frequently* asks me "what the hell are you doing here?'
> when I return from FMLA.

(Pl.'s Afft. at ¶¶ 7 & 9) (emphasis added).  This Affidavit contradicts Jackson's deposition

20

testimony because he testified that Jackson had used the term "hell" when speaking with him on one occasion, not that she used profanity frequently or routinely with him. In addition, when Jackson testified about the one instance wherein Allen alleged asked him "what the hell are you doing here," he testified he had "no idea" why the statement had been made and did not testify that the statement was made when he had just returned from an FMLA leave.

It is well-established that a plaintiff cannot defeat a motion for summary judgment by filing an affidavit that contradicts his or her earlier deposition testimony. *Trout v. FirstEnergy Gen. Corp*., 339 Fed. App'x. 560, 566 (6th Cir. 2009) (citing *Kelso v. City of Toledo*, 77 Fed. App'x. 826, 834 (6th Cir. 2003); *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Biechele v. Cedar Point, Inc*., 747 F.2d 209, 215 (6th Cir. 1984)). "The rationale for this rule is simple, '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting h[er] own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Trout,* 339 Fed. App'x at 566 (quoting *Reid*, 790 F.2d at 460)).

Accordingly, Jackson cannot establish that Allen engaged in comparable conduct but was not disciplined.

But Jackson also asserts that Krygowski engaged in similar conduct, or arguably worse conduct, but was not terminated for that conduct. During his deposition, Jackson testified that security supervisor Jim Krygowksi used profanity at the workplace. (Pl.'s Dep. at 102). Krygowski made comments such as calling employees "black mother fucker," telling a white employee "take your white ass out of here" or "I'm going to throw your ass the fuck out of here." (*Id*.). Jackson testified that Krygowski had called him, personally, a "black mother fucker." (*Id*.

21

at 103).  Jackson reported those comments by Krygowski to Jo Avery in Human Resources.

Avery and Bill Cooper told Plaintiff that they did not feel that conduct was harassment but

Jackson heard that Krygowski was suspended for a week. (*Id*. at 103-104).

Viewing the evidence in the light most favorable to Jackson, the Court concludes he has

established an issue of fact as to whether MotorCity's proffered reason for his termination is

pretextual.

### B.    Claim Based On Being Posted Outside

The third element of a prima facie case of retaliation is that the plaintiff suffered an

"adverse employment action."

MotorCity contends that Jackson may not establish a prima facie case of retaliation based

on his allegations of having been assigned to outside posts for more than 70 days straight because

he cannot establish the third element – that such actions are actionable adverse actions.

In response, Jackson states that "being posted [sic] in the dead of winter for 74 straight

days is an 'objectively demeaning change of work conditions' and 'intolerable to a reasonable

person' and an adverse employment action."  (Pl.'s Br. at 15).

MotorCity's Brief cites to cases applying the law as it relates to adverse actions for

purposes of Title VII claims.  In a recent case filed *after* Defendant's motion was filed, however,

the Sixth Circuit adopted the "*Burlington*" standard for retaliation claims under the FMLA,

correct.  *Crawford v. JP Morgan Chase & Co.*, __ Fed. App'x. __, 2013 WL 39849999 * 5 (6th

Cir. Aug. 6, 2013).  This is a less demanding standard than in Title VII cases. Under that

standard, the plaintiff "must show that a reasonable employee would have found the challenged

action materially adverse."  *Id*. at *6.  And whether a particular assignment is materially adverse

22

depends upon the circumstances of the particular case and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

The Court concludes that Jackson has created an issue of fact as to whether being posted to colder-climate positions for more than 70 days straight during the wintertime would be perceived as materially adverse by a reasonable person.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

The motion is GRANTED to the extent that the Court DISMISSES WITH PREJUDICE, as time-barred, Plaintiff's retaliation claims based upon Plaintiff's April 5, 2009 suspension from the cell phone incident and Plaintiff's April 10, 2009 suspension for abandoning his post.

The motion is DENIED in all other respects and Plaintiff's retaliation claims based upon his July 2, 2009 termination, and having been assigned to colder-climate posts for more than 70 days straight in the wintertime, shall proceed to trial.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  October 9, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 9, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

23